Gaudette v Gaudette (2023 NY Slip Op 06786)

Gaudette v Gaudette

2023 NY Slip Op 06786

Decided on December 28, 2023

Appellate Division, Third Department

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided and Entered:December 28, 2023

CV-23-0135
[*1]Linda Gaudette, Respondent,
v
Bruce Gaudette, Appellant.

Calendar Date:November 13, 2023

Before:Lynch, J.P., Clark, Ceresia, Fisher and Mackey, JJ.

Niles & Bracy, PLLC, Plattsburgh (John M. Crotty of counsel), for appellant.
Copps DiPaola Silverman, PLLC, Albany (Joseph R. Williams of counsel), for respondent.

Clark, J.
Appeals (1) from an order of the Supreme Court (William A. Favreau, J.), entered October 17, 2022 in Clinton County, which denied defendant's motion to enforce the parties' prenuptial agreement, (2) from an order and amended order of said court, entered January 26, 2023 and March 9, 2023 in Clinton County, directing, among other things, equitable distribution of the parties' marital property, and (3) from the judgment entered thereon.
In May 1977, plaintiff (hereinafter the wife) and defendant (hereinafter the husband) entered into a prenuptial agreement in anticipation of their wedding, which took place in June 1977 in the Province of Quebec, Canada. The wife filed for divorce in October 2020, and the husband thereafter filed a motion seeking to enforce the prenuptial agreement and seeking division of the parties' assets in accordance with its terms. Through an order entered October 17, 2022, Supreme Court found that the material terms of the prenuptial agreement were vague and undefined, rendering the agreement void; as such, the court denied the husband's motion. The parties proceeded to a bench trial in December 2022, where they stipulated to the value of most of the parties' property and accounts, as well as to the division of the same. At trial, the husband continued to seek division of certain disputed property in accordance with the prenuptial agreement — despite the court's earlier finding that said agreement was void — while the wife sought to have those assets divided equally. Supreme Court accepted the parties' stipulations and, through an order entered January 26, 2023, adopted the wife's proposal and divided the disputed property. Then, in March 2023, the court issued an amended order which was substantively identical to the January 2023 order except that it attached and incorporated the parties' stipulations and the wife's proposal. Thereafter, Supreme Court issued a judgment of divorce incorporating the March 2023 amended order. The husband appeals from the October 2022 order, as well as from the January 2023 order, the March 2023 amended order and the judgment of divorce.[FN1]
"[D]uly executed prenuptial agreements are generally valid and enforceable given the strong public policy favoring individuals ordering and deciding their own interests through contractual arrangements" (Van Kipnis v Van Kipnis, 11 NY3d 573, 577 [2008] [internal quotation marks and citations omitted]; accord Carter v Fairchild-Carter, 187 AD3d 1360, 1361-1362 [3d Dept 2020]).[FN2] "To form a binding contract, there must be a meeting of the minds, so that there is a manifestation of mutual assent that is sufficiently definite to assure that the parties are truly in agreement with respect to all material terms" (Matter of Eckert, 217 AD3d 1151, 1152 [3d Dept 2023] [internal quotation marks, brackets and citations omitted], lv dismissed 40 NY3d 1024 [2023]; see Harris v Schreibman, 200 AD3d 1117, 1124-1125 [3d Dept 2021]). Where a "contract is unambiguous, its construction [*2]is a matter of law, and the intent of the parties must be found within the four corners of the contract, giving a practical interpretation to the language employed and reading the contract as a whole" (Ficel Transp., Inc. v State of New York, 209 AD3d 1153, 1155 [3d Dept 2022] [internal quotation marks and citations omitted]; see Greenfield v Philles Records, 98 NY2d 562, 569 [2002]; Cerand v Burstein, 72 AD3d 1262, 1265 [3d Dept 2010]). "Ambiguity in a contract arises when the contract, read as a whole, fails to disclose its purpose and the parties' intent, or where its terms are subject to more than one reasonable interpretation" (Universal Am. Corp. v National Union Fire Ins. Co. of Pittsburgh, Pa., 25 NY3d 675, 680 [2015] [internal quotation marks and citations omitted]; accord Donohue v Cuomo, 38 NY3d 1, 13 [2022]). When presented with an ambiguous contract, the court should resort to extrinsic evidence — which may require an evidentiary hearing — to attempt to ascertain the parties' intent (see Donohue v Cuomo, 38 NY3d at 15; Evans v Deposit Cent. Sch. Dist., 183 AD3d 1081, 1083 [3d Dept 2020]; Matter of Delmar Pediatrics Asthma & Allergy Care, P.C. [Pasternack-Looney], 35 AD3d 987, 988 [3d Dept 2006]).
Here, upon finding that the language of the prenuptial agreement was ambiguous, Supreme Court skipped these steps and invalidated the agreement. In doing so, the court erred, as "[s]triking down a contract as indefinite and in essence meaningless is[,] at best[,] a last resort" (Matter of 166 Mamaroneck Ave. Corp. v 151 E. Post Rd. Corp., 78 NY2d 88, 91 [1991] [internal quotation marks and citation omitted]; accord Tompkins Fin. Corp. v John M. Floyd & Assoc., Inc., 144 AD3d 1252, 1254 [3d Dept 2016]). We now undertake this analysis, first considering whether the parties' intent can be gleaned from the four corners of the prenuptial agreement, giving its language and provisions "their plain and ordinary meaning" (O'Toole v Marist Coll., 206 AD3d 1106, 1108 [3d Dept 2022] [internal quotation marks and citations omitted]).
Pursuant to article II of the prenuptial agreement, the parties agreed to "contribute to the expense of the household in proportion to their respective means." Although "means" is not defined in the agreement, its plain and ordinary meaning makes clear that the parties intended to refer to their "[a]vailable resources" or "income" (Black's Law Dictionary [11th ed 2019], means). However, as the four corners of the agreement do not provide any guidance as to what is encompassed in the "expense of the household," the agreement is ambiguous and extrinsic evidence is required to ascertain the parties' intent (see Bailey v Fish & Neave, 8 NY3d 523, 528 [2007]; Matter of John U. v Sara U., 195 AD3d 1280, 1282-1283 [3d Dept 2021]; Evans v Deposit Cent. Sch. Dist., 183 AD3d at 1083). Article III is similarly ambiguous. Pursuant thereto, the husband has a duty to spend a specified sum on "household furniture and household effects" within [*3]the first year of marriage and a duty to replace such items as they "become worn or destroyed." Although undefined, as relevant to the household, "furniture" refers to "things such as chairs, tables, beds, cupboards, etc. that are put into a house . . . to make it suitable and comfortable for living . . . in" (Cambridge Dictionary, furniture [https://dictionary.
cambridge.org/us/dictionary/english/furniture]), while "household effects" refers to "[t]angible or movable personal property other than money" which "are used in connection with a home" (Black's Law Dictionary [11th ed 2019], goods, household goods; see Black's Law Dictionary [11th ed 2019], household effects). These definitions help narrow the types of items that the husband had a duty to acquire, but it remains ambiguous whether the parties intended for appliances and other household items to be subsumed within such contractual terms, requiring the court to resort to extrinsic evidence (see Bailey v Fish & Neave, 8 NY3d at 528). Supreme Court should also have resorted to extrinsic evidence to determine whether the parties had an objective intent which would trigger the husband's duty to replace household furniture or effects that became worn — defined as having become deteriorated by use (see Merriam-Webster.com Dictionary, wear [https://www.merriam-webster.com/dictionary/wear]; worn [https://www.merriam-webster.com/dictionary/worn]).
Having determined that the prenuptial agreement is ambiguous, we next consider whether the extrinsic evidence proffered by the parties resolves these ambiguities. As relevant to article II, the parties' affidavits make clear that, for the duration of the marriage, the husband and the wife met once per month to review "the expense[s] of the household" and the husband then gave the wife money to "cover [his] half of those expenses." As previously noted, the prenuptial agreement does not define what constituted an "expense of the household"; however, the parties' intent can be gleaned through their subsequent conduct, and their submissions reveal a mutual understanding that such term includes the bills and carrying costs for the marital residence as well as other common joint marital expenses, such as gifts for family and friends, rendering article II sufficiently definite (see Alternatives Fed. Credit Union v Olbios, LLC, 14 AD3d 779, 781 [3d Dept 2005]; see also Matter of 166 Mamaroneck Ave. Corp. v 151 E. Post Rd. Corp., 78 NY2d at 91). Turning to article III, however, the parties' submissions fail to resolve the ambiguities. For example, it is unclear whether marital gifts or joint expenditures may be included in the calculation to satisfy the husband's duty to "expend [a specified sum] within one year from the date of the marriage in the acquisition of household furniture and household effects," or whether appliances and other household items are encompassed within those terms. Further, although the prenuptial agreement clearly obliges the husband to pay [*4]the wife an additional specified lump sum "during the continuance of their marriage," neither the agreement nor the parties' submissions illuminate whether the parties intended for the husband's attempt to pay that sum after the commencement of the instant divorce action satisfies such obligation (compare Vella v Vella, 213 AD3d 1225, 1226-1227 [4th Dept 2023]).[FN3] Because the parties' submissions were insufficient to resolve the ambiguities in the prenuptial agreement, Supreme Court should have held an evidentiary hearing to allow the parties to submit further extrinsic evidence to aid the court in its attempt to resolve the ambiguities and, if possible, to ascertain the parties' intent with regard to the prenuptial agreement; we reverse and remand for such a hearing (see Cohen v Cohen, 163 AD3d 762, 763-764 [2d Dept 2018]; Fecteau v Fecteau, 97 AD3d 999, 1000 [3d Dept 2012]; Lahey v Lahey, 68 AD3d 1656, 1657-1658 [4th Dept 2009]).[FN4] In light of this determination, we must also reverse the portion of the judgment of divorce that involved the equitable distribution of the parties' assets (see e.g. Zeledon v Zeledon, 211 AD3d 1387, 1390 [3d Dept 2023]; Linger v Linger, 88 AD3d 1216, 1217-1218 [3d Dept 2011]).
To the extent not expressly addressed herein, we have reviewed the parties' remaining contentions and find that they have either been rendered academic or lack merit.[FN5]
Lynch, J.P., Ceresia, Fisher and Mackey, JJ., concur.
ORDERED that the appeals from the orders and the amended order are dismissed, without costs.
ORDERED that the judgment is modified, on the law, without costs, by reversing so much thereof as denied defendant's motion to enforce the prenuptial agreement and as determined equitable distribution; matter remitted to the Supreme Court for further proceedings not inconsistent with this Court's decision; and, as so modified, affirmed.

Footnotes

Footnote 1: Because the March 2023 amended order superseded the January 2023 order, the appeal from the January 2023 order must be dismissed (see Borelli v JB IV, LLC, 209 AD3d 1121, 1122 n 1 [3d Dept 2022]). Further, the husband's right to appeal from the October 2022 order and from the March 2023 amended order terminated upon the entry of the judgment of divorce; nevertheless, his appeal from said judgment brings up for review his arguments pertaining to said orders (see CPLR 5501 [a] [1]; Calcagno v Graziano, 200 AD3d 1248, 1250 n 1 [3d Dept 2021]).

Footnote 2: Although the parties' prenuptial agreement was executed in Quebec, Supreme Court considered that the parties had resided in New York for approximately 40 years of their 43-year marriage and applied New York law (cf. e.g. Matter of Midland Ins. Co., 16 NY3d 536, 543-544 [2011]). Inasmuch as the parties fail to present any argument regarding that determination on appeal, they have abandoned any challenge thereto (see Matter of Brenna EE. v Andrew DD., 214 AD3d 1039, 1040 n 2 [3d Dept 2023]), and we apply New York law in interpreting the prenuptial agreement.

Footnote 3: Other than noting that the prenuptial agreement allows the husband to pay "said sum in cash or by means or property, moveable or immoveable," we do not comment on whether the husband's purported down payments on the wife's vehicles during the marriage satisfy this obligation.

Footnote 4: We do not delve into every ambiguity present in the prenuptial agreement, including whether the specified sums are due in American or Canadian currency. On remand, Supreme Court should consider that the lack of specificity does not render a contract unenforceable and endeavor to ascertain the parties' intent and interpret the prenuptial agreement as a whole (see Ficel Transp., Inc. v State of New York, 209 AD3d at 1155; see e.g. Miller v Moore, 68 AD3d 1325, 1327 [3d Dept 2009]; Capital Dist. Enters., LLC v Windsor Dev. of Albany, Inc., 53 AD3d 767, 771 [3d Dept 2008]).

Footnote 5: Because the prenuptial agreement remains ambiguous, we are unwilling to speculate as to whether the parties' subsequent conduct served to modify its terms or whether a party should be estopped from enforcing the same (see Nassau Trust Co. v Montrose Concrete Prods. Corp., 56 NY2d 175, 183-184 [1982]). Further, we do not comment on whether either party has breached any term of the prenuptial agreement except to note that, contrary to the husband's assertion, any such breach may be remedied through the equitable distribution award (see Anonymous v Anonymous, 123 AD3d 581, 583 [1st Dept 2014]; Ungar v Savett, 84 AD3d 1460, 1461 [3d Dept 2011]).